[No. E012635. Fourth Dist., Div. Two. Jan. 11, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
KEITH DALE GRANISH, JR., Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I., III. and IV.

**COUNSEL**

Ross Thomas, Charles R. Khoury, Jr., and Howard C. Cohen, under appointments by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont, Gil P. Gonzalez and Warren P. Robinson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RICHLI, J.**—Defendant Keith Dale Granish, Jr., was charged with one count of murder (Pen. Code, § 187), one count of robbery (Pen. Code, § 211), and one count of unlawful driving or taking of an automobile (Veh. Code, § 10851). He was convicted by a jury of first degree felony murder and robbery. For the reasons which will appear, we affirm.

**FACTS**

On July 29, 1992, approximately 6 p.m., Michael Perry and two other employees were working at a car dealership in Riverside. Perry saw a van

pull up near the used car sales lot. Defendant and another man got out of the van. Defendant approached one of the other employees and asked to test-drive one of the cars on sale. The employee, believing (correctly, as it turned out) that defendant was not a serious buyer, refused. Defendant, however, continued browsing around the lot.

A few minutes later, Perry heard an engine revving and saw a white Toyota proceeding rapidly from the lot toward the street. The car, which belonged to the dealership, had yellow letters or numbers on the windshield. Nevertheless, Perry clearly saw defendant at the wheel. Perry, who was near the exit driveway, attempted to block the car's path by standing in the middle of the driveway. The driveway was approximately 10 to 12 feet wide. Perry waved his arms and shouted at defendant to stop. Defendant, wearing a "big smile," continued quickly toward the driveway. Perry had to jump out of the way to avoid being struck. Perry called police.

A short while later, a probation officer saw a white car go past at an intersection, driving on the wrong side of the street against traffic. The probation officer saw the white car go through several intersections without stopping for stop signs.

A motorcycle officer also saw the white car speed through an intersection without stopping for a stop sign. The motorcycle officer pursued the white car with red and blue lights and siren activated. The driver did not stop. The white car ran through several stop signs during the chase, which reached speeds over 70 miles per hour.[1] The white car eventually collided with a pickup truck, sending the white Toyota spinning out of control. The Toyota struck and killed a bicyclist before coming to rest against a tree.

When the motorcycle officer reached the scene, the white Toyota was unoccupied but the engine was running. The lifeless body of Daniel Daugherty lay by the road. Parts of Daugherty's smashed bicycle were strewn over the road (apparently, Daugherty was hit so hard his shoes, socks and wallet were also knocked from his body). Accident reconstruction testimony established the white Toyota was going 66 miles per hour when it struck the pickup truck, and 58 miles per hour when it struck Daugherty.

A few minutes after the collision, Officer Boyd found defendant not far away. Defendant was nervous and out of breath. Defendant's clothing was covered with plant debris, such as foxtails, seed pods and stickers.

---

[1] The motorcycle officer testified he reached speeds of 70 miles per hour, and was unable to gain ground on defendant.

Defendant testified in his own behalf at trial. Defendant testified that he met a friend, a transient named Tim, in Lake Elsinore on the afternoon of July 29, 1992. Defendant was living with his grandmother in Lake Elsinore at the time. With Tim was a person defendant had not seen before; Tim referred to the man as "Dog" or "Road Dog." Tim asked defendant if he wanted to go to Riverside. Defendant agreed, and the three men travelled to Riverside in Tim's van. During the trip, "Dog" and Tim said they were going to Riverside because they needed a car. Defendant said he could probably get them one. "Dog" said he would pay defendant $200 to get him a car. Defendant and Tim left "Dog" at a hamburger stand while they went to the car dealership and defendant took the white Toyota.

Defendant saw Perry standing behind a Mustang, working on the license plate. Defendant got into the white Toyota, which already had its engine running. Defendant put the car in gear and drove "fastly" [sic] out of the lot. Defendant testified there was no one in the driveway in front of him, but as he drove out of the driveway he heard Perry yelling at him. Defendant said there was "never" anyone in front of him in the driveway, waving his hands and yelling; defendant saw Perry through the passenger side window, to the passenger side of the Toyota. Perry was near the Mustang, and "I believe I saw him say, stop." Although defendant testified his vision was partially impaired by numbers on the windshield of the Toyota, he also admitted "I could see what was in front of me." Defendant testified he "couldn't see . . . too good" to the side of the windshield that had the numerals, "but I could still see that nobody was in front of the car." Defendant did not testify that he did not see someone in front of him—rather, when asked whether anyone had stood in his path and waved his arms at defendant, defendant flatly stated, "Nobody did that" and that "nobody was in front of the car and waved their hands." Although defendant "couldn't be positive" there was no one in front of the car, he was reasonably certain, because "that was the whole idea of me driving out. It was just [a] straight shot. He [Perry] was behind the car and I just drove out. Seemed simple."

Although defendant testified that his plan had been to go back to the hamburger stand and pick up "Dog," and thence return with "Dog" to Lake Elsinore, he claimed that instead he got out of the car when "Dog" got in. Defendant decided to go on foot to his father's house, which was located in the general area. Thus, defendant denied he was the driver of the Toyota during the chase and subsequent fatal collision. Defendant claimed the foxtails and other vegetation got onto his clothing because he stopped to rest briefly at times on his way to his father's house, before his arrest.

When defendant was accosted by police and arrested, he denied any involvement in either the car theft or the subsequent events. He told police he had been playing basketball with friends.

Another dealership employee testified on rebuttal that he saw Perry in the middle of the driveway waving his hands and yelling at defendant. As the car sped by, Perry was forced to jump out of the way to avoid being run over.

Police dispatch records showed that the report of the stolen Toyota was received at 6:12:59 p.m. and the traffic collision was reported at 6:15:46 p.m., less than three minutes later.

## DISCUSSION

### I. *Evidence and Instructions on Force or Fear**

. . . . . . . . . . . . . . . . . . . . . . . . . .

### II. *Access to Juror Information*

 Defendant next contends that the trial court improperly denied him access to juror information he needed to prepare a motion for new trial. Defendant argues he requested and the trial court should have granted him (or his counsel) the names, addresses and telephone numbers of *all* the jury members so he could investigate a claim of juror misconduct.

We reject the contention. Defendant was in fact allowed access to the key juror (and nonjuror) involved in the alleged misconduct. The juror unequivocally denied misconduct. Defendant evidently failed to interview the accused nonjuror at all, to interview other percipient witnesses, or to make a sufficient showing there was a genuine claim of misconduct so as to justify releasing the names, addresses and telephone numbers of the remaining jurors.[3]

After the verdicts, defendant submitted five affidavits executed by his relatives and friends. Four of the affidavits were nearly identical. Defendant's father, stepmother, uncle, and a friend of his parents each averred that they saw an older man in the courtroom during the trial. This man was later identified as Mr. Cave, husband of one of the jurors. The affiants saw Mr. Cave in the courtroom during periods when the jurors were excused. The affiants saw Mr. Cave standing near two witnesses in the hallway, while the witnesses were discussing papers in a briefcase. One of the witnesses took

---

*See footnote, *ante*, page 1117.

[3]The California Supreme Court has granted review in a case concerning a similar issue, *People* v. *Scott*█ (Cal.App.).

the briefcase to the stand with him while he testified and referred to some papers in the briefcase. The affiants averred they saw Mr. Cave leave the courtroom on one occasion with Juror Cave. Juror Cave allegedly said, " 'Why is he trying to confuse things?' " Mr. Cave responded, " 'Who?' " Juror Cave replied, " 'The D.A.' " or " 'The District Attorney.' " Because defendant's family members were exiting the courtroom quickly, none of the affiants heard anything further. Defendant's father, stepmother and grandmother also averred they saw Mr. Cave enter and exit the courtroom along with unspecified jurors, and saw him talking to jurors in the hallway at least two times. Defendant's father and grandmother averred they saw Mr. Cave talking to the deceased victim's father in the hallway on one occasion.

Pursuant to Code of Civil Procedure section 206,[4] defense counsel moved for an order disclosing the names, addresses and telephone numbers of all the jurors, in order to determine whether any jurors committed misconduct. The court ordered disclosure of the identifying information as to Juror Cave (and effectively as to her husband as well), but denied the request as to the remaining jurors.

Defense counsel talked to Juror Cave on the telephone. Juror Cave denied talking to her husband about the case at any time during the pendency of the trial, and specifically denied the fragment of conversation reported by defendant's relatives. Apparently, defendant never attempted to interview Mr. Cave.

Defendant's motion for new trial included duplicates of the affidavits of defendant's friends and relatives, but contained no affidavits from Juror Cave, Mr. Cave, the victim's father, or the witnesses near whom defendant's relatives claimed to have seen Mr. Cave stand on one occasion. The prosecutor was sworn and testified that, in a telephone interview, Juror Cave denied discussing any of the trial proceedings with her husband while the case was pending, and she stated that her husband never talked to her about what went on in the courtroom at times when the jury was not present. The court found no jury misconduct and denied the motion for new trial.

Defendant contends that the court was required to give him, on request, the names, addresses and telephone numbers, not only of Juror Cave, but of *all* the jurors so that he could properly develop his motion for new trial. We reject the contention.

We begin with the applicable statutory provisions. Section 206 was enacted in 1988. (Stats. 1988, ch. 1245, § 2, p. 4145.) It provided:

---

[4]All further statutory references are to the Code of Civil Procedure unless otherwise stated.

"(a) Prior to discharging the jury from the case, the judge in a criminal action shall inform the jurors that they have an absolute right to discuss or not to discuss the deliberation or verdict with anyone. The judge shall also inform the jurors of the provisions set forth in subdivisions (b), (c), and (d).

"(b) Following the discharge of the jury in a criminal case, the defendant, or his or her attorney or representative, or the prosecutor, or his or her representative, may discuss the jury deliberation or verdict with a member of the jury, provided that the juror consents to the discussion and that the discussion takes place at a reasonable time and place.

"(c) Any unreasonable contact with a juror by the defendant, or his or her attorney or representative, or by the prosecutor, or his or her representative, without the juror's consent shall be reported to the trial judge forthwith.

"(d) Any violation of this section shall be considered a violation of a lawful court order and shall be subject to reasonable monetary sanctions in accordance with Section 177.5 of the Code of Civil Procedure.

"(e) Nothing in the section shall prohibit a peace officer from investigating an allegation of criminal conduct." (§ 206.)

It is plain that, from its inception, section 206 was meant to protect jurors from unwanted posttrial intrusions.

In 1992, the Legislature enacted Senate Bill No. 1299 (1992 Reg. Sess.), which amended section 206 and added section 237 to the Code of Civil Procedure, to remedy a problem with the existing law. "The bill was prompted by a Los Angeles case in which a defendant convicted of murdering his estranged wife and soliciting his daughter's murder hired a private investigator to get the addresses of members of his jury 'for the presumed purpose of working harm.' (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1299 (1991-1992 Reg. Sess.) as introduced Feb. 25, 1992.) Three of the jurors contacted had unlisted telephone numbers which were discovered by the investigator through public records including voter registration. (Assem. Com. on Public Safety (1991-1992 Reg. Sess.) New Statutes Affecting the Criminal Law, pp. 35-36.)" (*Jones* v. *Superior Court* (1994) 26 Cal.App.4th 1202, 1209 [31 Cal.Rptr.2d 890].) Although existing law made it a misdemeanor to threaten a juror in a criminal case, nothing prohibited possession of juror addresses, nor prohibited assisting a defendant in obtaining juror addresses. Senate Bill No. 1299 gave the court a measure of control over juror information, and created a mechanism for sealing the information and for prohibiting future access. The bill also made it a separate misdemeanor to improperly obtain or release sealed juror information.

Senate Bill No. 1299 added subdivision (f) to section 206, and enacted section 237. Section 206, subdivision (f), provided:

"(f) Notwithstanding Section 237, a defendant or defendant's counsel may, following final adjudication of a criminal proceeding, request that the court provide personal juror information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing issues on appeal or any other lawful purpose. This information may include jurors' names, addresses, and telephone numbers.

"Pursuant to this subdivision, the court shall provide the information requested to the defendant's counsel or any agent of the defendant's counsel but may limit dissemination as provided under subdivision (c) of Section 237." (Stats. 1992, ch. 971, § 2, No. 11 West's Cal. Legis. Service, p. 3969.)

The Legislative Counsel's Digest of Senate Bill No. 1299 pointed out that "[e]xisting law requires that, except as specified, the sittings of every court shall be public." Section 237 proposed to change existing law by providing that juror information could be kept confidential or its use limited in whole or in part. (Legis. Counsel's Dig., Sen. Bill No. 1299 (1992 Reg. Sess.).)

Section 237 provided in pertinent part:

"(a) The names of qualified jurors drawn from the qualified juror list for the superior court shall be made available to the public upon request unless the court determines, pursuant to subdivision (b), that a compelling governmental interest requires that this information should be kept confidential or its use limited in whole or in part.

"(b) At the conclusion of a criminal jury proceeding, the court may, upon a juror's request, motion of counsel, or on its own motion, order that all or part of the court's record of personal juror identifying information be conditionally sealed upon finding that a compelling governmental interest warrants this action. For purposes of this section, 'compelling governmental interest' includes, but is not limited to, protecting jurors from physical harm or the threat of physical harm. Any person may petition the court for access to these records and, in the absence of an express finding of continuing risk, the records shall be made available.

"(c) The court may limit access to records sealed under subdivision (b) to the defendant, the defendant's counsel, or the defendant's investigator for the purpose of developing issues of [sic] appeal or for any other lawful purpose. The court may require agreement that the defendant, defendant's counsel, or defendant's investigator not divulge jurors' identities or identifying information to others." (Stats. 1992, ch. 971, § 3, No. 11 West's Cal. Legis Service, p. 3970.)

As the court stressed in *Jones* v. *Superior Court, supra,* 26 Cal.App.4th 1202, "It is clear the Legislature was trying to close the door to access of juror addresses and telephone numbers to the extent that it could—not open it to information on demand." (*Id.* at p. 1209.)

There are sound policy reasons for this solicitude for jurors. As the court pointed out in *People* v. *Rhodes* (1989) 212 Cal.App.3d 541 [261 Cal.Rptr. 1], the integrity of the jury process itself must be maintained. Continued public support and participation by diverse and representative citizens is necessary, yet the voir dire process is lengthy, tedious and invasive. If jurors were also to be routinely subjected to posttrial interrogation, many, if not most, would avoid service. If jurors' names, addresses and telephone numbers were freely given to the losing party, jurors would be subject to the risk of harassment. Routine disclosure might also interfere with the incentives against jury tampering: " 'A single juror who reluctantly joined in a verdict is likely to be sympathetic to the overtures of defeated parties, and to be persuadable to the view that his own consent rested upon false or impermissible considerations; the truth will be hard to ascertain. In the process, the trier itself will be tried, all at the behest of a dissatisfied party aided by the second thoughts of a vaguely uncomfortable juror.' [Citation.]" (*People* v. *Rhodes, supra,* 212 Cal.App.3d 541, 549.) Free and open discussion amongst the jurors during deliberations " '. . . will surely be stifled' " and the policy favoring finality of verdicts undermined if disclosure of jurors' names, addresses and telephone numbers were unlimited. (*Ibid.*)

On the other hand, there is also a strong public interest in the ascertainment of truth in judicial proceedings, and a verdict reached by prejudicial juror misconduct should not be permitted to stand.

In view of the competing policies, including the jurors' right to privacy and the need to discover potential misconduct, the *Rhodes* court proposed a balancing of interests to avoid abuses and misuse of juror information, and other ills, while permitting jury misconduct to be exposed. The *Rhodes* court held that juror information could be disclosed upon a timely motion and "a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial. . . . [¶] Absent a satisfactory, preliminary showing of possible juror misconduct, the strong public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of the juror information as a matter of right in each case. This rule safeguards both juror privacy and the integrity of our jury process against unwarranted

'fishing expeditions' by parties hoping to uncover information to invalidate the jury's verdict. At the same time, it protects a defendant's right to a verdict uninfluenced by prejudicial juror misconduct by permitting, upon a showing of good cause, access to juror information needed to investigate allegations of juror misconduct.[6]" (*People* v. *Rhodes, supra*, 212 Cal.App.3d 541, 552.)

Like *People* v. *Rhodes, supra*, 212 Cal.App.3d 541, Senate Bill No. 1299 was addressed to juror protection concerns. Section 237, subdivision (a), not only permits juror records to be kept confidential, it also permits the "use [of the information] to be limited in whole or in part." Juror records may be sealed on request of a juror, motion of counsel, or the court's own motion, if there is a compelling governmental interest for so doing. A " 'compelling governmental interest' " is defined as "includ[ing], but . . . not [being] limited to, protecting jurors from physical harm or the threat of physical harm." (former § 237, subd. (b).) The *Rhodes* court identified several compelling governmental interests, such as the jurors' constitutional right to privacy, and the strong public interest "in maintaining the integrity of our jury system, including encouraging public participation in the process, fostering free and open discussion among jurors, promoting verdict finality, reducing incentives for jury tampering, and discouraging harassment of jurors by losing parties eager to have the verdict set aside." (*People* v. *Rhodes, supra*, 212 Cal.App.3d 541, 551.) In *Jones* v. *Superior Court, supra*, 26 Cal.App.4th 1202, the court held that simply ". . . a juror's refusal to discuss the deliberations or verdict is a 'compelling governmental interest' sufficient to authorize the court to keep that juror's address and telephone number sealed." (*Id.* at p. 1209, review den. Sept. 29, 1994.)

Defendant relies on *People* v. *Simms* (1994) 24 Cal.App.4th 462 [29 Cal.Rptr.2d 436], for the proposition that he was entitled to the names, addresses and telephone numbers of all the jurors upon request, so long as he had a lawful purpose for asking. In *Simms*, the defendant's lawyer asked for the address and telephone number of one juror because the defendant's aunt had reported seeing the juror, during trial, in a conversation with the prosecutor. The trial court held a hearing on the matter and denied the request. The defendant appealed.

The Court of Appeal stated that the request for the juror's identifying information led "ineluctably to the conclusion that the information was

---

"[6]A showing of good cause to obtain juror names, addresses and phone numbers does not give counsel license to abuse the information. Jurors 'retain a clear right to refuse to talk to counsel[,] and counsel has a duty not to harass or embarrass the jurors. (Rules Prof. Conduct of State Bar, rule 7-106, subd. (D).)' (*People* v. *Atkins* [(1988)] 203 Cal.App.3d [15] at p. 27 [249 Cal.Rptr. 863].)" (*People* v. *Rhodes, supra*, 212 Cal.App.3d at p. 552.)

requested for the purpose of developing issues for appeal or for some other lawful purpose (such as a motion for new trial)." (*People* v. *Simms, supra,* 24 Cal.App.4th at p. 466.) The court held that "[n]o more was required," taking the position that the statute clearly compelled the court to turn over the information if requested for any lawful purpose. Thus, the *Simms* court stated, "[t]he trial court was neither required nor entitled to hold a hearing to determine whether Simms was entitled to Juror Wright's address and telephone number." (*Ibid.*)

The *Simms* court held that the provisions of sections 206 and 237 showed that "the Legislature rejected *Rhodes*'s 'preliminary showing' requirement as too burdensome when balanced against the strong public interest in the ascertainment of truth in judicial proceedings. Under the plain language of both statutes, all the convicted defendant has to show is that he wants the requested information 'for the purpose of *developing* issues on appeal or for any other lawful purpose.' (§§ 206, subd. (f), 237, subd. (d), italics added.) No more is required. (See Legis. Counsel's Dig., Sen. Bill No. 1299 (1991-1992 Reg. Sess.) ['This bill would *require* the court to provide the requested information to the defendant's counsel . . . but would permit the court to limit dissemination, as specified' (italics added)].) Under these circumstances—where the Legislature has enacted a statute addressing an issue which has been the subject of judicial construction—it is presumed the Legislature was fully cognizant of such construction and, when the statute deviates from the judicial construction, the logical inference is that the lawmakers intended to alter the law. [Citation.] There is no reason to conclude otherwise in this case." (*People* v. *Simms, supra,* 24 Cal.App.4th 462, 468-469.)

The *Simms* court's wholesale rejection of *Rhodes* was, we think, unwarranted. The legislative provisions do not "deviate[]" greatly "from the judicial construction"; indeed, as the *Simms* court conceded, the Legislature was undeniably "concerned about jurors' privacy rights." (*People* v. *Simms, supra,* 24 Cal.App.4th 462, 469, 468.) Former section 206, subdivision (f), provided that "a defendant or defendant's counsel may . . . request that the court provide personal juror information . . . *necessary* for the defendant to communicate with jurors *for the purpose of developing issues on appeal or any other lawful purpose.*" (Italics added.) The requirement that the defendant must show he needs the information "for the purpose of developing issues on appeal or any other lawful purpose" is language of restriction; the defendant must show good cause for the disclosure.

■ The statutory provisions clearly indicate an intent to restrict the defendant from receiving juror personal information unless necessary. The

*Simms* court evidently read the language in the last sentence of section 206, subdivision (f)—that the court "*shall* provide the information requested" (italics added) —to mean that the court must, in a mandatory sense, give the information requested. However, that interpretation takes the language out of its context. The first clause of subdivision (f) provides that a defendant or a defendant's counsel may ask for juror information. The last sentence of subdivision (f) states that the information is to be given to defendant's *counsel* or counsel's agent. Any reference to *the defendant*, as the person who may receive the requested information, is conspicuously absent. Presumably, the omission was deliberate, given the legislative purpose to protect jurors from posttrial harassment. Thus, although the defendant may, himself or herself, ask for juror information, the information can be given only to counsel or counsel's agent. The phrase that the court "*shall provide* the information requested *to the defendant's counsel* (italics added) or any agent of the defendant's counsel" is not a statement of entitlement, it simply limits the persons to whom the information should be given, *if access is granted*. The interpretation of the *Simms* court, that sections 206 and 237 essentially required "information on demand," is contrary to the manifest legislative intent.[5]

Section 237 provides that the court may seal jury information on motion of a juror, of counsel, or the court on the court's own motion, if there is a compelling governmental interest for so doing.

▉ It does not appear from the record that the court entered an order sealing juror information at the time the jurors were discharged. Indeed, it does not appear that the court gave any thought or consideration to the matter at all, and it largely failed to comply with its duty to inform the jurors of their statutory rights.

At the conclusion of the trial here, the court told the jurors: "Ladies and gentlemen, that does conclude your services in this case. . . .

". . . . . . . . . . . . . . . . . . . . . . .

"Additionally, the admonition about discussing the case is lifted at this time. If you want to talk about the case, you can with anyone that you want

---

[5]*Simms* is tellingly distinguishable from this case on its facts. In *Simms*, the defense was denied access to the one critical juror whose statement would have settled the matter. Here, the court *granted* the defense access to Juror Cave, who denied any misconduct. According to the *Simms* court, that should have settled the matter. To the extent the issue was not settled—i.e., because *Mr. Cave* and not Juror Cave was accused of talking to other unidentified jurors—the defense here was never restricted from contacting him, a nonjuror. Either the defense never did so (in which case it has no cause for complaint) or it did inquire of Mr. Cave and he too denied all misconduct (same result).

to; or if you don't want to talk about it, you don't have to. A lot of times the attorneys appreciate being able to talk to you after a trial and get some of your viewpoints, but that's strictly up to you whether you want to do that or don't want to do that. [¶] But with that in mind, your service in this case is concluded. . . . If you do want to remain and talk a minute, if you'd wait out in the public area. The attorneys will be out in just a moment."

These statements did inform the jurors that they did not have to talk about the case if they did not wish to, but the court's remarks were made in the apparent context of explaining the lifting of the admonition, given throughout the trial, that the jurors must not discuss the case with anyone. The court failed to convey to the jurors that they had an absolute right, provided by statute, to discuss or not to discuss the case with anyone. The court told the jurors that the attorneys might like to talk with jurors about the case, and that the jurors did not have to do so, but again failed to inform the jurors specifically that such communication must be with the consent of each individual juror, or that the communication must be limited to reasonable times and places. The court made no pretense of informing the jury that unreasonable contact with a juror was a violation of court order, to be reported at once to the court, or that such a violation was subject to monetary sanction. The court's remarks failed to comply fully with the requirements of section 206, as it then read.

█ It was, no doubt, precisely to remedy the sort of oversight that occurred here that sections 206 and 237 were amended in 1993 to require the court additionally to inform jurors expressly of their statutory right to request that their juror identifying information be sealed. (Stats. 1993, ch. 632, §§ 1, 2, Assem. Bill No. 1915 (1993 Reg. Sess.).) It is questionable whether, in the absence of an express advisement, the jurors here were aware of any of their statutory rights.

In *Simms*, as here, the court did not make an express order sealing juror records at the conclusion of the trial. As an aside, the *Simms* court made the further gratuitous statement that there was no governmental interest, "compelling or otherwise" for sealing juror records in that case, which it characterized as a "garden-variety robbery." (*People v. Simms, supra,* 24 Cal.App.4th 462, 465, fn. 3.) We note that other courts have not given the term "compelling governmental interest" such an interpretation; moreover, it is not the nature of the criminal charge, nor the complexity (or lack thereof) of the evidence adduced at trial, but the nature of the *jurors' interests* (as balanced against the interests of the defendant in obtaining the information) which justifies sealing or limiting access to the records. Jurors may wish to assert their absolute right not to talk about the deliberations, even in a

"garden-variety" case; jurors may be subject to harassment, threats, or pressure to undermine their verdicts, regardless of the charge.

 In view of the court's failure here to adequately inform jurors of their rights, so that they could protect themselves, and the court's apparent failure to give the issue of sealing the records any genuine consideration until the question was placed before it, coupled with the right of the court to seal records *on its own motion*, we conclude the court was entitled to consider the issue at the time of defendant's motion for juror identifying information. In effect, the court ruled that juror information as to all the jurors except Juror Cave should be sealed in deference to the jurors' privacy rights and the absence of a showing by defendant that he had a legitimate need for the information.

This implied ruling by the trial court was proper. The accusations of misconduct were raised solely by defendant's friends and relatives (not unbiased sources) who had themselves to be admonished early in the proceedings to refrain from improper contacts with jurors. Moreover, one of the affiants—defendant's mother or stepmother, Susan Granish—ominously told the jurors, "Sleep well. He wasn't even there," as they filed from the courtroom following their discharge. Defendant's parents had to be warned again at the end of the trial, this time under pain of contempt, not to harass the jurors, Juror identifying information may be ordered confidential to protect jurors from precisely the kind of intimidation, harassment, hostility or threats exemplified by the conduct of defendant's family. The evidence fully justified the implicit order sealing the jury information (as to all jurors except Mrs. Cave).

As noted, defendant bore the burden of demonstrating good cause for disclosure of the (effectively) sealed juror information. Defendant's showing was inadequate. Defendant did not submit any affidavit from Juror Cave (although defense counsel did relate the substance of a conversation she had with Mrs. Cave, in which Mrs. Cave denied discussing the case at all with her husband), to whom he was allowed access. Defense counsel did not, so far as the record shows, even attempt to talk to Mr. Cave. Nor did the defense apparently contact the trial witnesses to determine what they discussed when Mr. Cave stood near them.

The claim of jury misconduct—the predicate for obtaining the jurors' names and addresses—was wholly speculative at best. The most defendant's evidence showed was that Juror Cave may have made one isolated remark to her husband that she found the prosecutor's presentation confusing. There was no evidence they discussed the case further at any time; in fact, Juror

Cave denied even this isolated remark. Mr. Cave, a member of the public, attended the trial. He was not a member of the jury, and his presence had no bearing on a claim of jury misconduct. Mr. Cave may have asked where the jurors would be entering and exiting the courtroom. This clearly was not misconduct. He stood in a public hallway where other persons (witnesses) may have discussed some undisclosed papers. There was no evidence Mr. Cave talked to Mrs. Cave about the case, no evidence Mr. Cave talked to other jurors about the case, no evidence Mr. Cave overheard witnesses talking about the case (and none that he discussed whatever he heard—if anything—with anyone). Defendant made no showing of juror misconduct.

Finally, even if *Simms*'s statutory analysis is correct, and ours in error, reversal is required under the California Constitution only where there has been a miscarriage of justice. (Cal. Const., art. VI, § 13.) There was none here because there is no showing defendant was denied information which could have aided his motion for new trial. He did not interview available witnesses, nor even, so far as the record shows, the key nonjuror (Mr. Cave) as to whom the most serious (if speculative) allegations were made. Unlike *People* v. *Simms, supra,* 24 Cal.App.4th 462, defendant here *was* granted access to the juror who was critical to his inquiry; that juror flatly denied any misconduct, which, according to *Simms,* should have put an end to the matter.

III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Hollenhorst, Acting P. J., and McDaniel J.,† concurred.

Appellant's petition for review by the Supreme Court was denied April 11, 1996.

---

*See footnote, *ante,* page 1117.

†Retired Associate Justice of the Court of Appeal, Fourth District, sitting under assignment by the Chairperson of the Judicial Council.